UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                     :

NATHANIEL PARRIS,                     :

                 Plaintiff,       :

                                       :

          -v-                   :         18 Civ. 8299 (JPC)

                                     :

NEW YORK CITY HOUSING AUTHORITY and  :        <u>OPINION AND ORDER</u>
DARRELL LAVAL,                    :

                                       :

                Defendants.     :

                                       :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Nathaniel Parris brings this action against his former employer, the New York City
Housing Authority ("NYCHA"), and his former supervisor at NYCHA, Darrell Laval
(collectively, "Defendants"). Four causes of action remain after the Honorable Victor Marrero, to
whom this case was formerly assigned, dismissed one of Parris's causes of action and narrowed
two others. Parris brings Counts One and Two against NYCHA, alleging retaliation in violation
of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and its state analog, the New
York False Claims Act ("NYFCA"), N.Y. Fin. Law § 187 *et seq.*, in connection with his
submission of reports to the NYCHA Inspector General ("IG") regarding what he perceived as
mismanagement at NYCHA properties and misuse of NYCHA funds. In Count Three, Parris
alleges damages from NYCHA's negligent hiring, retention, and supervision of its employees.
And in Count Five, Parris alleges that Laval defamed him.

      With discovery now concluded, Defendants have moved for summary judgment seeking
dismissal of all remaining Counts. For the reasons that follow, the Court grants Defendants'

motion, dismissing with prejudice Counts One and Two and dismissing without prejudice Counts Three and Five, over which the Court declines to exercise supplemental jurisdiction.

## I. Background

### A.    Facts[1]

"NYCHA is a public benefit corporation . . . that provides public housing to over 400,000 New York City residents."  Defts. 56.1 Stmt. ¶ 1.  Laval, "the Director of the Mixed Finance Department [at NYCHA] between June 2015 and August 2018," *id.* ¶ 3, was Parris's "direct supervisor from December 2015 until [Parris's] retirement in September 2017," *id.* ¶ 4.  Parris initially held the position of "Administrator for Operational Reviews" at NYCHA.  *Id.* ¶ 15.  In May 2016, Parris was promoted to Regional Asset Manager ("RAM") in NYCHA's Mixed Finance Department, *id.* ¶ 2, resulting in a salary increase of approximately $5,000, *id.* ¶ 16.[2]  From the time of that promotion through his retirement, Parris "did not apply for any promotions or positions within NYCHA."  *Id.* ¶ 17.

---

[1] The following facts are drawn primarily from Defendants' statement of undisputed material facts pursuant to Local Civil Rule 56.1(a), Dkt. 111 ("Defts. 56.1 Stmt."), and Parris's counter-statement and supplemental statement under Rule 56.1(b), Dkt. 118 ("Pl. Counter 56.1 Stmt."). Parris separately numbered the paragraphs that respond to Defendants' statement of undisputed material facts, *see id.* at 1-9, and those that assert additional material facts, *see id.* at 9-16. Citations to that document by only paragraph number refer to the former portion; the latter is also cited by paragraph number but with the letter "a" appended to signify that the citation is to Parris's additional material facts. Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Parris does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add his own "spin" on the fact or otherwise dispute the inferences drawn from it.

[2] Although Parris denies paragraphs 15 and 16 of Defendants' Rule 56.1 statement, his denial does not refute the assertions of fact made by Defendants. As to paragraph 15, Parris merely seeks to add his own "spin" to the statement. *See* Pl. Counter 56.1 Stmt. ¶ 15. As to paragraph 16, his purported denial does not actually deny the fact asserted by Defendants but rather provides an unsupported assertion that he still made less than his colleagues after the raise associated with his promotion. *See id.* ¶ 16. The Court does not rely on that assertion because Parris has failed to provide any evidentiary support.

"As a RAM, [Parris] oversaw day-to-day operations at 10 or 11 NYCHA developments, and directly supervised property managers and superintendents at those developments." *Id.* ¶ 18. Of particular relevance here, Parris oversaw the developments of Manhattanville Houses ("Manhattanville"), Moore Houses ("Moore"), Castle Hill Houses ("Castle Hill"), Marble Hill Houses ("Marble Hill"), and Drew Hamilton Houses ("Drew Hamilton"). Dkt. 115-4 ("Hr'g Tr.")[3] at 62:21-63:5.[4]  Parris's job duties included "providing oversight and ensuring property management staff complied with NYCHA's procurement procedures." Defts. 56.1 Stmt. ¶ 19. He was also responsible for "address[ing] 'all budgetary issues, such as staffing and funding' and provid[ing] 'guidance and support' to property managers and superintendents at developments in his portfolio." *Id.* ¶ 20 (quoting Hr'g Tr. at 57:8-18, 55:21-24, 58:22-59:4).

Funding for the developments under Parris's purview came from a byzantine structure. Manhattanville, Drew Hamilton, Castle Hill, and Marble Hill were all owned by a limited liability corporation, NYCHA Public Housing Preservation I, LLC ("LLC I"). *Id.* ¶ 10. "The Mixed Finance Department manages developments in the LLC I . . . portfolio[], as well as selected Section 8[5] developments and conventional public housing developments." *Id.* ¶ 9. "Moore . . . was a conventional public housing development." *Id.* ¶ 10. "Each development in the LLC I

_____

[3] Citations to "Hr'g Tr." are to an examination conducted of Parris by an attorney with NYCHA's Law Department pursuant to New York Public Housing Law § 157(3) on October 3, 2017. *See* Dkt. 115 ¶ 2.

[4] It appears that, at some point, Drew Hamilton was removed from Parris's portfolio, *see* Hr'g Tr. at 63:2-3 (Parris testifying that "they took Drew Hamilton away from me"), although neither side emphasizes this in their briefing.

[5] Section 8 refers to a federally funded program through which the United States Department of Housing and Urban Development ("HUD") "pays rental subsidies so eligible families can afford decent, safe, and sanitary housing. The [Section 8] program is generally administered by State or local . . . public housing agencies." 24 C.F.R. § 982.1; *see also About Section 8*, NYC Housing Authority, available at https://www.nyc.gov/site/nycha/section-8/about-section-8.page (last visited Mar. 29, 2024).

portfolio had an annual pre-determined operating budget to fund their operating expenses," to "include all expenses associated with the day-to-day maintenance and repair of the development." *Id.* ¶ 11. "All operating expenses incurred in connection with LLC I developments are paid for using funds in the LLC I Operating Account." *Id.* But "if a development in the LLC I portfolio [did] not have sufficient funds in its Operating Account to pay for operating expenses," the Mixed Finance Department was able to request that NYCHA's Department of Financial Planning and Analysis (the "DFPA") transfer funds "from another development in the LLC I portfolio to cover the funding gap." *Id.* ¶ 12. It appears that Janet Abrahams, a Vice President with NextGen Operations ("NGO") at NYCHA, possessed the authority to approve such requests, *see* Dkt. 115-17 at 52-53, although the requests would typically be routed through two individuals—Andrew Faubel and Cindi Steinmetz—for approval, *see* Dkt. 113 ("Steinmetz Decl.") ¶¶ 8-9; Dkt. 114 ("Faubel Decl.") ¶¶ 6-7. "LLC I developments also have access to a Replacement Reserve Account, which can only be used to fund capital improvement projects (to replace capital assets or provide capital improvements)."[6] Steinmetz Decl. ¶ 7.

Starting in late 2016, Parris submitted a number of reports to the IG. Most of these reports were about Luis Rodriguez, the Manhattanville Superintendent. The reporting first arose after Rodriguez "requested funding to address various deficiencies at Manhattanville" in November 2016 in preparation for an upcoming Public Housing Assessment System ("PHAS") inspection.[7] Defs. 56.1 Stmt. ¶ 23. Although the funding request was subsequently approved, *id.* ¶ 24, on

---

[6] "All LLC I developments deposit $400 per apartment unit per year to fund the Replacement Reserve Account." Defs. 56.1 Stmt. ¶ 13; *accord* Steinmetz Decl. ¶ 7.

[7] One of Parris's additional responsibilities "was to conduct pre-inspections of NYCHA developments to identify and address areas needing repairs in preparation for [PHAS] Real Estate Assessment Center ('ERAC') inspections" that HUD both requires be conducted and conducts. Defs. 56.1 Stmt. ¶ 21.

December 30, 2016, Rodriguez received a "counseling memorandum" in connection with the request, *id.* ¶ 26. As explained in NYCHA's Human Resources Manual, counseling memoranda "are not disciplinary actions." Dkt. 115-8 at 1. "Rather, [they] may be used to address the conduct or performance of an employee, whether or not the employee is entitled to notice of charges and a disciplinary hearing." *Id.* The counseling memorandum issued to Rodriguez specifically focused on his "improperly replacing compactor room doors, which 'wasted NYCHA's funds,' and failing to adhere to NYCHA's procurement procedures (by failing to obtain three bids and permitting a contractor to install drain covers without a purchase order)." Defs. 56.1 Stmt. ¶ 26 (brackets omitted) (quoting Dkt. 115-15).[8]

The day before the counseling memorandum was issued, Parris "sent a copy of the memorandum, along with three other counseling memoranda that were to be issued to Rodriguez, to Alfred Carletta at the IG's office." *Id.* ¶ 27.[9] A little more than two weeks later, "[o]n January 19, 2017, [Parris] re-sent the same four counseling memoranda to Bergia Telesford at the IG's office." *Id.* ¶ 28. The next day, January 20, 2017, Parris sent Laval "a list of vendors who performed work at Manhattanville without purchase orders," noting that Rodriguez had violated NYCHA's procurement procedures by having the vendors perform the work before obtaining purchase orders. *Id.* ¶ 29. Laval responded the same day, writing that he and Parris had discussed the matter the day before and that he expected Parris to, "as [Parris] had done in the past," "forward th[e] information to the proper department for investigation." *Id.* ¶ 30. At his deposition, "Laval

---

[8] Although Parris denies this fact, his denial only references pictures of the compactor room doors, *see* Pl. Counter 56.1 Stmt. ¶ 26 (citing Dkt. 117-11), and he has therefore not provided any facts refuting Defendants' statement of fact.

[9] Parris's Rule 56.1 counter-statement also denies this statement of fact, but the denial does not actually contest the factual assertion and instead seeks only to add the legal conclusion that his actions were "protected activity." *See* Pl. Counter 56.1 Stmt. ¶ 27.

testified [Parris] told him he had concerns about Rodriguez because Rodriguez replaced 'a whole lot of doors that didn't need to be replaced' and spent 'an enormous amount of money.'"  *Id.* ¶ 39 (quoting Dkt. 115-7 (Laval deposition transcript) at 108:25-109:12, 110:22-111:5).[10]  And indeed, also on January 20, 2017, Parris sent the IG "(i) the list of vendors who performed work at Manhattanville without purchase orders, and (ii) the vendors' proposals."  *Id.* ¶ 31.  Two days later, Parris emailed Laval, telling him that he found the new doors Rodriguez had purchased for Manhattanville uninstalled and stored at the development.  Dkt. 115-20.  "Later that day, [Parris] sent the IG pictures of the newly fabricated doors that he had found."  Defts. 56.1 Stmt. ¶ 33.  From January 31, 2017 through March 2, 2017, Parris continued to send the IG more information reporting what he perceived as misconduct by Rodriguez in connection with Rodriguez's duties at Manhattanville.  *Id.* ¶¶ 34-36.  Finally, "[o]n June 22, 2017, Parris informed the IG that Rodriguez was transferred to Drew Hamilton."  *Id.* ¶ 37.

Parris also reported an issue regarding a separate development, Castle Hill, to the IG in the summer of 2017.  Specifically, he reported what he believed was an inappropriate request for funding to re-paint balconies that had recently been painted and issues with a contractor that performed poor work at the development.  *Id.* ¶¶ 48-52.[11]  In addition, in early May 2017, Parris "filed a complaint with NYCHA's Department of Equal Opportunity ('DEO') alleging he suffered 'repeated retaliatory acts' by Laval 'for over a year,' and 'the retaliatory acts increased due to [Parris's] cooperation' with the IG's ongoing investigation."  *Id.* ¶ 59.  The complaint was quickly

---

[10] Parris denies this paragraph of Defendants' Rule 56.1 statement, but only as to a portion of the fact not relied upon above.  *See* Pl. Counter 56.1 Stmt. ¶ 39.

[11] Again, Parris denies a fact asserted by Defendants, here paragraph 52 of Defendants' Rule 56.1 statement, but the denial lacks merit.  He denies the fact on the basis that it stated a legal conclusion, but the paragraph only describes Parris's testimony at his deposition and does so accurately.  *Compare* Defts. 56.1 Stmt. ¶ 52 *with* Pl. Counter 56.1 Stmt. ¶ 52.

resolved, however: "On May 25, 2017, Plaintiff and Laval entered into a conciliation agreement and Plaintiff withdrew his DEO complaint." *Id.* ¶ 60.[12]

While these events unfolded, several issues surfaced at four developments: Moore, Castle Hill, Marble Hill, and Drew Hamilton.

### 1.    Moore

In August 2016, a roof tank at Moore "started leaking." *Id.* ¶ 72.[13]  After being notified of the leak by Parris on August 22, 2016, *see* Dkt. 115-42 at 1, Laval emailed Parris on September 9, 2016 to see if a vendor proposal had been obtained for work to address the leak, *id.* at 4.  Parris responded that the vendor had "just returned from vacation" and that another individual, Mr. Nieto, was "pushing" to get a proposal.  *Id.*  "[O]n September 27, 2016, after having obtained the vendor proposal," the Property Manager at Moore, Abe Alex, requested $8,700 for repairs to the roof tank. *Id.* at 8-9.  Three days later, funds were allocated to fulfill the request.  Defts. 56.1 Stmt. ¶ 75.  Yet, by February 2017, the "roof tank at Moore was leaking again." *Id.* ¶ 76.  Accordingly, on April 7, 2017, Alex sent a new request to Parris for an additional $10,000 for repairs, copying Andrew Korbul, another RAM in the Mixed Finance Department.  Dkt. 115-44 at 7.  Parris responded to the request by emailing Laval and Korbul, copying Alex, and stating, "[y]our assistance is being requested (see below)." *Id.* at 6.  Korbul replied, asking what the total cost was, to which he did

---

[12] Parris contests this fact, but his denial only asserts that Laval breached the conciliation agreement and therefore Parris does not refute that he signed the agreement and withdrew his complaint.  *See* Pl. Counter 56.1 Stmt. ¶ 60.

[13] Parris denies paragraphs 71 through 77 of Defendants' Rule 56.1 statement with the same explanation for each denial: that the facts "omit[] that as provided in emails dated May 1, 2017, the roof leak impacted the top floor apartments and an email addressed to Kathy Pennington dated August 29, 2017, discusses the collapse of the top floor ceiling at Moore Houses."  Pl. Counter 56.1 Stmt. ¶¶ 71-77 (citing Dkt. 117-42).  But the cited August 29, 2017 email, Dkt. 117-42, does not in any way contradict the facts presented by Defendants.  Accordingly, the Court relies on these paragraphs from Defendants' Rule 56.1 statement.

not receive a reply from Alex until April 20, when Alex reiterated that he was seeking $10,000. *Id.* at 5-6.  After receiving no response, Alex followed up with Korbul on April 25, and Korbul directed Alex to contact Faubel in the DFPA.  *Id.* at 4-5.

The next day, Alex emailed Faubel to submit a request for $60,000, "which included a $10,000 request for the roof tank, and emphasized that the roof tank repair was needed urgently." Defts. 56.1 Stmt. ¶ 78.  This funding request languished and was not approved until late August 2017.  In the interim, Laval followed up with both Korbul and the DFPA on multiple occasions to check on the status of the funding.  *See* Dkt. 115-44 at 1 (follow-up email with Korbul after the request for assistance from Parris); Dkt. 115-45 (follow-up emails with DFPA on May 16, May 18, and May 24, 2017).  Parris and Alex also followed up multiple times during this period.  *See* Dkt. 117-38 (May 1, 2017 email from Parris to Laval); Dkt. 117-39 (May 1, 2017 email from Alex to Faubel); Dkt. 117-40 (May 1, 2017 email from Parris to Laval).  On August 21, 2017, with the request still yet to be approved, Parris "renewed the funding request because the roof condition had gotten worse.  Faubel at DFPA finally responded" at this point.  Defts. 56.1 Stmt. ¶ 81.  Faubel, Parris, and Laval exchanged emails on that day regarding the funding request.  Dkt. 115-46 at 1-2.  Ultimately, the funding request required an exemption certificate, which was "submitted to Laval for approval on August 28, 2017," Defts. 56.1 Stmt. ¶ 82, and was "signed and forwarded for processing" by September 5, one week later, Dkt. 115-47 at 1.

### 2. Castle Hill

As relevant to this case, three sets of events pertaining to Castle Hill unfolded over the course of 2017.  First, on February 6, 2017, Parris emailed Laval and Korbul, notifying them that Castle Hill's heating system needed to be repaired.  Dkt. 117-15.  The next day, Laval emailed Korbul, telling him to "reach out to . . . to secure the necessary funds so heating can move forward to making repairs."  Dkt. 117-16.  A little less than two weeks later, Parris emailed Korbul to ask

for an update on the funding for the repairs to the heating system at Castle Hill.  Dkt. 117-17.
Roughly a month after that, Laval asked Kevin Wells—a "Heating Administrator," Pl. Counter
56.1 Stmt. ¶ 18a—to "follow-up" on heating complaints at Castle Hill after Laval received a
complaint about the heating situation from a local government representative.  Dkt. 117-18.  The
repairs apparently were still pending for another month, as Robert Knapp, the "Director of Heating
Management Services Department," emailed Laval and Korbul on April 22, 2017 to ask if the
"money [was] in place" so that the requisite heating parts could be ordered.  Dkt. 117-19 at 1.  On
April 28, 2017, Parris emailed Laval again, asking for assistance in securing funding for the
repairs.  Dkt. 117-20 at 2.  Laval responded on the same day, writing that the funding had been
requested and work was underway to secure the funds.  *Id.* at 1.  In his response, Laval also told
Parris to "become more filmiar [sic] with how funds are sevured [sic] for LLC 1 properties and
not just make statements without no teeth to it," to "speak with Mr. Korbul and me before you
send out e-mails without having all tje [sic] facts," and finally to not "include Janet [Abrahams]
on every email pertaining to normal NGO-MF operation that is handle [sic] thru my office."  *Id.*

Second, in June 2017, emails were exchanged regarding the repainting of a terrace at Castle
Hill.  It appears that on June 6, 2017, a funding request for the painting submitted by Korbul was
rejected.  Dkt. 117-22 at 2.  Wallace Duprey, the Castle Hill Superintendent, followed up on the
rejection, asking what needed to be done to secure the funding since the request had been
"started . . . over 8 months" prior.  *Id.* at 1-2.  About a week, later Parris responded, asking Duprey
what the request was about as Parris had not previously been aware of it.  *Id.* at 1.  Then, on the
same day, Abigail Segarra, a Supervisor of Small Procurement in NYCHA's Procurement
Department, clarified that the request was to paint the terrace at Castle Hill.  *Id.*  It appears,

9

however, that Duprey had not obtained the requisite three price quotes to repaint the terrace, and Segarra denied the request on that basis. Dkt. 117-23 at 1-2.

Third and finally, a month later, in July 2017, Parris emailed Duprey, copying Laval, to inform Duprey that he had received repeated complaints about, and had himself observed, "unacceptable conditions" at a "recent reglazed tub" in a Castle Hill apartment. Dkt. 117-24. It appears that this tub had been reglazed in May 2017. *See* Dkt. 117-21. Parris subsequently emailed Robert Diienno at the IG's office to raise concerns about the contractor that performed the reglazing work, which apparently was Teenusa. Dkt. 117-25 at 1; *see infra* n.23. A week later, Parris emailed Duprey to notify him that the tenant was reluctant to have the contractor return to her apartment to complete repairs due to the poor quality of prior work. Dkt. 117-26 at 1. But a day later, Duprey updated Parris on the tub glazing, informing him that the contractor had returned to "glaze the bathtub over" and Parris reported in response that the formerly complaining tenant "expressed that the tub reglaze workmanship was good and she is pleased." Dkt. 117-27 at 1.

### 3.    Marble Hill

Issues also surfaced at Marble Hill, mainly revolving around staffing shortages and the heating system. As of January 31, 2017, Parris and Javier Almodovar, a "heating supervisor," had identified a number of issues with the heating system at Marble Hill. Dkt. 117-29 at 1. Parris sent a picture of the problematic heating system components to Laval that evening, copying, among others, Abrahams and Korbul but not Almodovar. *Id.* Roughly an hour later, at 8:45 p.m., Laval responded by adding Almodovar to the email chain, asking Parris why he did not send the pictures to Almodovar, and telling Almodovar that the pictures showed a situation that was "clearly . . . unacceptable and need[s] to be fixed." *Id.* Laval emphasized to Almodovar that "if this is the kind of service we are providing," it was "problematic to say the least." *Id.* Luis Ponce, a Vice President of Operations at NYCHA, then replied, informing Laval that Almodovar and

Parris had been working together, had a plan to address the issues, required "funding to proceed," and needed Laval's "staff to follow up on cross connections." Dkt. 117-28. Eight minutes later, Laval emailed Juan Rosado, a RAM and therefore presumably a member of Laval's staff, asking if staff had been assigned to Marble Hill "to follow-up on cross connections." Dkt. 117-29 at 3.

The next day, February 1, 2017, Abrahams emailed Parris and Laval, expressing her concern about the situation at Marble Hill. *Id.* at 2. She requested information on the cost for repairs to the heating system so that she could work to "isolate the funds immediately." *Id.* She also noted that she knew "replacement [would] not occur this heating season but at least we will be in a position to get this done when the boilers shut down for overall" and asked Parris and Laval to provide a list of temporary measures to "at least hold this together until the season is over." *Id.* Parris responded with a list of "short term fixes to address the heating issues," told Abrahams that he would "contact & meet with Heating to [see] what's needed for the boiler room," and committed to keeping her "updated on the progress." *Id.* Next, on March 4, 2017, Parris "notified the department of several calls that were received from residents [at Marble Hill] regarding their lack of heat and hot water." Pl. Counter 56.1 Stmt. ¶ 31a (citing Dkt. 117-31). Eleven days later, Carl Walton, "the Deputy Director from the Office of the Vice President, sent out an email with an attachment showing that there were a total of 219 heat and hot water complaints at Marble Hill, which was the highest in [the] public housing and Mixed Finance portfolio." *Id.* ¶ 32a (citing Dkt. 117-32). And the next day, Kevin Wells, an administrator with Heating & Fuel Oil Remediation at NYCHA, emailed a number of individuals including Parris and Laval, listing the number of tanks in the heating system that needed to be replaced at Marble Hill. Dkt. 117-33. No further evidence on the resolution of these heating system problems at Marble Hill has been presented to the Court.

In addition to the heating system issues, Marble Hill experienced significant staffing shortages. On April 24, 2017, the Property Manager for Marble Hill expressed to Parris over email that she was "completely overwhelmed here at Marble Hill Houses." Dkt. 117-34. She wrote that she had already spoken to Laval about the staffing shortage and was now "appealing" to Parris. *Id.* She further explained that she was down four staff members, including a superintendent, and that she had emailed the relevant department "several times for these existing vacancies." *Id.* She pleaded that if she did not "get help very soon this place will fall apart." *Id.*[14] Parris responded to the Property Manager, stating that he would "reach out to HR immediately for an update on your vacancies" and assuring her that he would keep her posted. Dkt. 115-49 at 1-2; Defts. 56.1 Stmt. ¶ 87. In that response, "Plaintiff added Camille Hayes [], an administrative assistant in the Mixed Finance Department, to the email chain. Hayes responded that she believed 'all was approved by Budget' but that she sent the request to Faubel in DFPA as well." Defts. 56.1 Stmt. ¶ 88 (bracket and citation omitted); *see* Dkt. 115-49 at 1. The parties have not highlighted for the Court any evidence on whether this staffing issue was resolved.

### 4.    Drew Hamilton

Finally, Parris has raised a variety of events at Drew Hamilton starting in late 2016 and reaching through the summer of 2017. First, in November 2016, Parris received an email from a resident there claiming that "her name was forged on a transfer document by someone in the

---

[14] In his Rule 56.1 counter-statement, Parris claims that he then emailed Laval about these vacancies on April 24, 2017 and that Abrahams "followed up to Plaintiff's email and requested . . . a status of each vacancy and that she would work to expedite the matter." Pl. Counter 56.1 Stmt. ¶¶ 35a-36a. The record citations for these statements, however, are simply the same email that the Property Manager sent to Parris about being "completely overwhelmed at Marble Hill Houses." *See* Dkt. 117-35; Dkt. 117-36. The Court therefore declines to rely on these asserted facts from Parris.

management office." Pl. Counter 56.1 Stmt. ¶ 43a.[15]  On February 28, 2017, following a Resident

Association Meeting at Drew Hamilton five days earlier, Parris emailed Teri Dawson, a Project

Manager for the development, to recap complaints and concerns raised at the meeting. Dkt. 117-

44 at 1-5.  Five hours later, Dawson responded to Parris's email, providing further information on

each of the complaints, as Parris had requested.  *See id.*  Laval was copied on both emails.  *Id.*

Next, on March 6, 2017, Ronald Boddie, a Property Maintenance Supervisor at Drew Hamilton,

received a counseling memorandum from Dawson for taking ten business days to have

"development canopies" cleaned at Drew Hamilton (as Boddie had been directed by Parris).  Dkt.

117-45.  Shortly thereafter, on March 10, 2017, Parris issued Dawson two memoranda, one for

unsatisfactory attendance for arriving late to work, and a second for a number of problems,

including failure to monitor employees' time and attendance, failure to take corrective action for

employees with missing swipes, unsatisfactory building and grounds conditions, unlocked

entrance and exit doors, and mismanagement regarding move-outs.  Dkt. 117-46.

Early the following month, on April 2, 2017, Parris emailed Abrahams and Laval, with

Korbul copied, regarding "Dawson and Boddie's failure to address a number of pre-PHAS

inspection findings" at Drew Hamilton.  Pl. Counter 56.1 Stmt. ¶ 47.  Two days later, Parris

emailed Laval to request that Boddie "be demoted immediately." Dkt. 117-48 at 2.  An hour and

forty minutes later, at 8:50 a.m., Laval emailed Maria Edmonson in Human Resources at NYCHA,

---

[15] Parris also asserts that he brought this matter to the attention of Teri Dawson, a Project
Manager at Drew Hamilton, who, according to Parris, "told him to leave the matter alone."  Pl.
Counter 56.1 Stmt. ¶ 43a.  In addition, Parris claims that the "IG and Mr. Laval were informed of
the incident."  *Id.*  But Parris does not provide a record citation for either factual assertion, so the
Court does not consider them in deciding the instant motion.

*see* Pl. Counter 56.1 Stmt. ¶ 48, to request that Boddie be demoted "immediately."  Dkt. 117-48 at 1.[16]

Then, on April 26, 2017, there was another meeting for Drew Hamilton residents.  Dkt. 115-29 at 1.  The day after the meeting, Dawson sent Laval and Abrahams a lengthy email describing Parris's derogatory treatment of Dawson at the meeting.  Dkt. 115-28 at 2-4.  After Abrahams asked Laval "what on earth" the email was about, Laval provided further detail, writing that Parris had called Dawson "incompetent" and that Parris had "blamed [Dawson] for poor supervision and stated that other Supervisor's [sic] with far less seniority perform better than Ms. Dawson."  *Id.* at 1.  Laval further noted that Wayne Brumfield, the President of the Tenants' Association at Drew Hamilton, "felt appalled by Mr. Parris'[s] comments and that he was very disrespectful towards Ms. Dawson."  *Id.*  In addition, Laval recounted an incident when Parris "pos[ed] as an HPD inspector" when questioning a mental health therapist about an "alleged incident" between the therapist's client and Dawson.  *Id.*  Ultimately, Laval concluded that he would be issuing a counseling memorandum to Parris based on his investigation and follow-up of the incidents,[17] and noted that he was "really concerned with other allegations staff have made against Mr. Parris which some is [sic] currently being followed up by various NYCHA Dept's."  *Id.*  Abrahams responded that "[t]his is appalling if the statements are true.  We never hang our

---

[16] On May 11, 2017, Parris emailed Abrahams to follow up on a meeting the day before, attaching documents to support statements Parris had made which apparently concerned his request that Boddie be demoted.  Dkt. 117-51.  In addition, on June 21, 2017, Laval sent an email indicating that Boddie would be reporting to his new assignment at Wise Towers.  Dkt. 117-50.  Parris also claims that Boddie was promoted back to the position of Property Maintenance Supervisor after that reassignment, but has provided no record citation for that factual assertion, so the Court does not rely on it in deciding the instant motion.  *See* Pl. Counter 56.1 Stmt. ¶ 50a.

[17] Laval also received a written complaint from a NYCHA tenant, who claimed that Parris had acted "unprofessional[ly]" and had "cursed, criticized, and scorned" Dawson.  Dkt. 115-29.

dirty laundry out in public, this is not the NGO way." *Id.* Eventually, on June 7, 2017, Parris was sent an instructional memo regarding his behavior at the residents meeting. Dkt. 115-30.

In the interim, Parris, Dawson, and Laval exchanged emails regarding Dawson's upcoming departure from Drew Hamilton. First, on Friday, April 21, 2017, Parris requested a list of information to help ensure a "smooth transition for the incoming Manager." Dkt. 117-49 at 4. Parris sent his email at 8:54 a.m., and stated that the information had to "be submitted by 3:00 p.m." that day for his review. *Id.* Laval then responded—keeping only Parris, Abrahams, Korbul, and himself on the email thread—to suggest to Parris that he give Dawson until the close of business on the following Monday to respond, observing that 3:00 p.m. would not give Dawson "enough time to capture the information" that Parris requested. *Id.* at 3-4. Parris replied to Laval's email by stating that he had "concerns with Ms. Dawson remaining at Drew Hamilton Houses until May 8th knowing that she will be transferred and the problems with it." *Id.* at 3. Laval then responded to Parris to reiterate that May 8th was the effective date of Dawson's transition, but noted that he and Parris could discuss the matter. *Id.* On Monday, May 1, 2017, at 2:02 p.m., Parris emailed Laval advising that he still had not yet received the transition report from Dawson and asked for guidance on how to proceed. *Id.* at 2. At 3:36 p.m. the same day, Laval emailed Dawson, asking her to provide the requested information. *Id.* Parris then replied again, asking if there was "a date for this report to be submitted," explaining that he "w[ould] need time to review prior to the new Manager report." *Id.* at 1. Laval told Parris that he would have the report the following morning and that Dawson was advised of the timeline. *Id.* The parties have not provided the Court with evidence on whether, and if so when, Dawson's report was ultimately sent to Parris.

**B.      Procedural History**

After Parris originally filed this case in New York Supreme Court for New York County, Defendants removed the case to federal court on September 12, 2018.  Dkt. 1.  On October 18, 2018, Parris filed the Amended Complaint, Dkt. 6, and on November 1, 2018, Defendants answered, Dkt. 10.  On February 26, 2019, Judge Marrero issued a Decision and Order dismissing Count Four.  *Parris v. N.Y.C. Hous. Auth.*, 364 F. Supp. 3d 284, 291 (S.D.N.Y. 2019).  With respect to Counts One and Two, Judge Marrero dismissed Parris's claims against Laval but permitted the claims to proceed as asserted against NYCHA.  *Id.* at 290.  Judge Marrero provided a detailed recitation of the procedural history of this case up to that point, *id.* at 286-88, and the Court assumes familiarity with that history and does not repeat it here.[18]

Following Judge Marrero's Decision and Order, the parties engaged in discovery and on April 4, 2022, Defendants moved for summary judgment.  Dkts. 83-88.  On May 26, 2022, prior to Parris opposing the motion, the Court stayed this case following Parris's filing for bankruptcy.  Dkt. 91.  The Court lifted that stay on November 7, 2022, and set a schedule for the remaining briefing on the pending summary judgment motion.  Dkt. 97.  On January 24, 2023, Parris filed his opposition to Defendants' motion.  Dkts. 100-103.  On January 30, 2023, Defendants requested an extension of time for their reply because Parris filed fifty-one exhibits that lacked bates-stamps in opposing Defendants' summary judgment motion.  Dkt. 104; *see* Dkt. 102 (declaration from Parris's counsel with exhibits lacking bates-stamps).  The Court granted the request, and additionally ordered Parris to produce bates-stamped versions of the exhibits.  Dkt. 105.  Subsequently, Defendants sought leave to file a motion to strike the non-bates-stamped exhibits after Parris's counsel informed Defendants that he would not be able to provide bates-stamped

_____

[18] On September 29, 2020, this case was reassigned to the undersigned.  *See* Dkt. 42.

versions of the exhibits, claiming they were produced by Parris's prior counsel, and Defendants then realized that not all of the exhibits had in fact been produced in discovery by Parris's prior counsel.[19]  *See* Dkt. 106 at 1; Dkt. 108.

After a conference—at which the Court discussed with the parties, *inter alia*, Defendants' proposed motion to strike—the Court denied Defendants' summary judgment motion without prejudice.  Dkt. 109 at 1.  The Court ordered Parris's counsel "to confer with his client and ensure that he has produced all e-mails in his possession responsive to Defendants' discovery demands," and further ordered that "[a]ny responsive e-mails that [had] not yet been produced . . . be produced by March 10, 2023."  *Id.*  Defendants were similarly ordered to produce "the full e-mail chains and any additional contextual e-mails uncovered in reviewing their internal records" that pertained to the emails that Defendants sought to strike.  *Id.* at 1-2.  In addition, Defendants were granted leave to re-depose Parris with respect to any newly produced documents.  *Id.* at 2.  And, finally, the Court set a briefing schedule for a renewed motion for summary judgment from Defendants. *Id.*

On April 14, 2023, Defendants filed the instant motion for summary judgment as to all of Parris's claims that had survived Judge Marrero's February 26, 2019 Decision and Order.  Dkts. 110-11, 112 ("Motion"), 113-15.  On April 27, 2023, Parris opposed the motion.  Dkts. 116 ("Opposition"), 117-18.  And on May 5, 2023, Defendants replied.  Dkts. 119 ("Reply"), 120.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[19] On March 31, 2021, Parris's prior counsel withdrew from the case.  Dkt. 67.  On April 29, 2021, Parris's current counsel appeared on his behalf.  Dkt. 69.

56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . .  may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences,

or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### III.  Discussion

**A.      Retaliation Claims Under the Federal False Claims Act and the New York False Claims Act Against NYCHA**

In Counts One and Two, Parris alleges that NYCHA and Laval violated the FCA and its state analog, the NYFCA.  Because Judge Marrero dismissed these claims to the extent asserted against Laval, *Parris*, 364 F. Supp. 3d at 289-90, they remain only as against NYCHA.  As "[t]he NYFCA follows the federal False Claims Act," New York courts "look toward federal law when interpreting the New York act."  *State ex rel. Seiden v. Utica First Ins.*, 943 N.Y.S.2d 36, 39 (1st Dep't 2012); *accord Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019).  The Court's analysis below regarding the FCA's substantive elements therefore applies with equal force to Parris's NYFCA claim.

To establish retaliation under the FCA, a plaintiff must prove that: "(1) the employee 'engaged in activity protected under the statute,' (2) 'the employer was aware of such activity,' and (3) the 'employer took adverse action against' the employee because of the protected activity." *Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, at *1 (2d Cir. Jan. 17, 2024) (summary order) (quoting *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017)).  Defendants argue that Parris lacks sufficient evidence on the first and third elements.  The Court agrees that Parris has not come forward with evidence that would permit any rational jury to find in his favor on the third element, and in particular that he

19

suffered any adverse employment action, and thus does not reach whether he has presented sufficient evidence as to the first element.[20]

Parris alleged in his Amended Complaint that he suffered three categories of adverse action: (1) Laval issued him counseling memoranda, (2) Laval undermined the success of developments Parris oversaw by transferring funds away from Parris's accounts and delaying funding requests at Parris's developments, and (3) Laval constructively discharged Parris.  Am. Compl. ¶¶ 15, 18, 24, 26.  In their summary judgment motion, Defendants argue that these are either not cognizable as adverse actions or factually incorrect based on undisputed record evidence. Motion at 14-19.  Parris's opposition, however, asserts only that he suffered adverse action by way of "having his material responsibilities significantly diminished."  Opposition at 6; *accord id.* at 17-19.  As support for his argument, Parris primarily points to instances where staffing and funding requests at developments he oversaw went unfulfilled.  *Id.* at 17-19.  Thus, Parris has abandoned any theory of adverse action premised on constructive discharge or the issuance of counseling memoranda.  *See Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("'[W]hen a party fails adequately to present arguments' in a brief, a court may properly 'consider those arguments abandoned.'" (quoting *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004))); *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) (noting that it is particularly appropriate to treat arguments not presented as abandoned "in the case of a counseled party," where "a court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned"); *see also Camarda v. Selover*,

---

[20] As Parris's failure to provide sufficient evidence as to the third element is dispositive, the Court also does not address Defendants' argument that Parris's NYFCA claim should be dismissed pursuant to Rule 12(b)(6) because Parris failed to provide adequate notice of that claim. *See* Motion at 5-7.

673 F. App'x 26, 30 (2d Cir. 2016) ("Where . . . a counseled non-moving party submits a partial response arguing that summary judgment should be denied as to some claims while not mentioning others, that response may be deemed an abandonment of the unmentioned claims.  Even where abandonment by a counseled party is not explicit, a court may infer abandonment from the papers and circumstances viewed as a whole." (internal quotation marks and alteration omitted)).  Parris also does not assert that there are any material facts in dispute relevant to the determination of whether he suffered an adverse action.  *See* Opposition at 16-19.  The Court therefore assesses whether the evidence supporting the sole theory advanced in Parris's briefing—*i.e.*, that his material responsibilities were significantly diminished—is sufficient to survive Defendants' motion.

To prevail on the third prong of the FCA retaliation analysis, Parris would need to demonstrate that he suffered an adverse action because he engaged in protected activity.  This "final element of an FCA retaliation claim 'requires proof of both adverse action and causation.'" *Liss v. Heritage Health & Hous., Inc.*, No. 19 Civ. 4797 (LTS), 2023 WL 2267366, at *9 (S.D.N.Y. Feb. 28, 2023) (quoting *New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 477 (S.D.N.Y. 2021)).  The Second Circuit has yet to define "adverse action" for FCA retaliation claims, but courts in this Circuit have followed the lead of other Circuits and utilized a material adversity standard borrowed from Title VII.  *See, e.g.*, *United States v. Spectra Holdco, LLC*, No. 17 Civ. 2732 (NGG), 2024 WL 457110, at *7 n.8 (E.D.N.Y. Feb. 6, 2024); *Mirza v. Garnet Health*, No. 20 Civ. 556 (PMH), 2022 WL 826410, at *11 (S.D.N.Y. Mar. 17, 2022); *Dhaliwal v. Salix Pharms., Ltd.*, No. 15 Civ. 706 (DLC), 2019 WL 5067164, at *4 (S.D.N.Y. Oct. 9, 2019).  Under this standard, "[e]xamples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  A mere "alteration of job responsibilities" or inconvenience does not qualify as a material adverse change.  *Id.* (quoting *Terry*, 336 F.3d at 138).  The Second Circuit has also yet to address what standard of causation applies in this context, but courts in this District have followed the but-for causation standard, borrowing from Title VII retaliation law.  *Malanga v. New York Univ.*, No. 14 Civ. 9681 (WHP), 2018 WL 333831, at *3-4 (S.D.N.Y. Jan. 9, 2018) ("[T]his Court joins the chorus of courts recognizing a 'but-for' causation standard under the FCA."); *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12 Civ. 8433 (DLC), 2017 WL 3278917, at *7 (S.D.N.Y. Aug. 1, 2017) (explaining that the language of the FCA—that retaliation must be "because of" of the protected activity—"typically 'imports, at a minimum, the traditional standard of but-for causation'" (quoting *Abercrombie & Fitch Stores*, 575 U.S. at 772-73)); *see also New York ex rel. Khurana*, 511 F. Supp. 3d at 479-80 (holding that the but-for causation standard applies to NYFCA claims); *cf. Stewart v. City of New York*, No. 22-2775, 2023 WL 6970127, at *2 (2d Cir. Oct. 23, 2023) ("To succeed on a [Title VII] retaliation claim after a defendant has established a legitimate, non-discriminatory reason for the adverse action, the plaintiff must present evidence that retaliation was the 'but-for' cause of the action." (citing *Univ. of Tex., Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013))).[21]

---

[21] In addition, the Second Circuit "has implicitly endorsed the application of the *McDonnell Douglas* framework to Section 3730(h) claims."  *Forkell v. Lott Assisted Living Corp.*, No. 10 Civ. 5765 (NRB), 2012 WL 1901199, at *10 (S.D.N.Y. May 21, 2012) (citing *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010)); *accord Liss*, 2023 WL 2267366, at *9.  There are "three phases" of this framework:

> (1) the employee bears the initial burden of producing evidence sufficient to support a prima facie case of retaliation; (2) the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; and (3) the burden shifts

Parris has failed to adduce any evidence of an adverse action. As he admits, his position, title, salary, and job duties were unchanged in the period following his reports to the IG until his retirement in September 2017. Defts. 56.1 Stmt. ¶ 17; Pl. Counter 56.1 ¶ 17. This alone leaves his retaliation claim on unstable footing. *See Mudholkar v. Univ. of Rochester*, No. 00-7412, 2000 WL 1476576, at *2-3 (2d Cir. Oct. 4, 2000) (finding no adverse employment action under Title VII where the employee retained his title, "suffered no diminution in pay or benefits," "maintained the same responsibilities" and membership on a faculty committee, and relied only on "his own unsupported, conclusory statements, that his new position is any less prestigious or that his duties have been significantly altered" to try to establish that he suffered an adverse action). Parris instead resorts to a more amorphous theory of adverse action premised on a variety of incidents and interactions with Laval concerning Moore, Castle Hill, Marble Hill, and Drew Hamilton, arguing that Laval intentionally deprived Parris's developments of funding and staffing in a manner that materially diminished Parris's job responsibilities by undermining his ability to do his job. Opposition at 17-19. But Parris has not provided any evidence from which a rational jury could conclude that Laval created a material adverse change in the terms and conditions of his employment. Instead, the evidence that Parris cites establishes, at most, that he experienced mere inconveniences, which do not amount to adverse action.

With respect to Moore, Parris claims that Laval "diminished [his] responsibilities . . . by not providing him the funding to fix" the failing roof tank, "therefore . . . not permitting Plaintiff

---

back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation.

*Liss*, 2023 WL 2267366, at *9 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). For the reasons set forth below, Parris has failed to come forward with evidence sufficient to demonstrate that any adverse action was taken, so the Court need not conduct analysis under this framework.

to do his job." *Id.* at 17.   The record completely belies Parris's contention.   First, the two individuals at DFPA primarily responsible for approving funding requests from the Mixed Finance Department—Faubel and Steinmetz—submitted declarations under penalty of perjury attesting that Laval never instructed them to delay or deny requests pertaining to Parris's developments. Steinmetz Decl. ¶¶ 8-9; Faubel Decl. ¶¶ 6-7.   And Faubel and Steinmetz both further stated that they would not "have heeded" any such instruction to deny or delay funding requests "without good cause shown" for doing so.   Steinmetz Decl. ¶ 9; Faubel Decl. ¶ 7.   Parris has provided no evidence contradicting or even calling into question these assertions.   Second, and more importantly, the record evidence that Parris cites provides no basis for concluding that Laval took any action to delay funding for fixing the roof tank at Moore.   Funds were promptly allocated to address the initial leaking in September 2016.   *See* Defts. 56.1 Stmt. ¶ 75.   It is true that after the roof tank started leaking again in February 2017, the subsequent funding request took roughly four months to receive approval.   *Compare* Defts. 56.1 Stmt. ¶ 78 (initial request) *with id.* ¶ 82 (approval); Dkt. 115-47 at 1 (same).   But that, without more, is not enough to establish an adverse action.   *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 211 (2d Cir. 2010) ("Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions . . . ." (citing *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000), *abrogated on other grounds by Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010))). Furthermore, while the funding request was pending, Laval followed up multiple times in efforts to secure the funding.   *See* Dkt. 115-44 at 1 (follow-up email with Korbul following Parris's request for assistance); Dkt. 115-45 (follow-up emails with DFPA on May 16, May 18, and May 24, 2017).   In addition, when it became clear that an exemption certificate was needed to secure the funding, Laval promptly approved the certificate and submitted it for processing.   *See* Defts.

56.1 Stmt. ¶ 82; Dkt. 115-47 at 1.  None of this indicates any action by Laval to diminish Parris's responsibilities.  Parris has simply cited to no evidence from a which rational jury could infer that he suffered a material adverse change in the terms and conditions of his employment due to actions taken by Laval or anyone else at NYCHA in connection with events at Moore.

Parris's interpretation of events at Marble Hill is similarly bereft of factual support.  Parris argues that Laval did not provide him with "what he needed" to address the complaints about heat and hot water at Marble Hill and that Laval did not "properly staff[] the building."  Opposition at 17.  The evidence presented certainly establishes that there was a staffing shortage at Marble Hill: the Property Manager told Parris that she was "completely overwhelmed" and that she was short four staff members.  Dkt. 117-34.  No evidence, however, indicates that Laval or anyone else at NYCHA took action to prevent Parris or the Property Manager from filling those positions.  Parris points to the fact that the Property Manager told Parris that she had already spoken with Laval about the staffing shortage before emailing Parris about the issue.  Opposition at 17.  From this, Parris wants the Court to make the entirely unsupported inference that Laval somehow undermined him by preventing the hiring of staff at Marble Hill.  If anything, the fact that the vacancies had been approved by the Budget department, *see* Defts. 56.1 Stmt. ¶ 88, supports the inference that NYCHA management was supporting Parris in his efforts to secure additional staffing at Marble Hill.[22]

---

[22] Parris cites Exhibit 35 of his attorney's Declaration, Dkt. 117-35, for the factual proposition that he "sent an email to Mr. Laval regarding [the Marble Hill Property Manager]'s email stating that vacancies in [Parris's] sector are impacting performance indicators."  *See* Opposition at 18.  But Exhibit 35 is just the same email from the Property Manager to Parris in which she told Parris that she was overwhelmed.  *Compare* Dkt. 117-34 *with* Dkt. 117-35.  Thus, not only does Parris's citation fail to support the factual assertion he makes, but what it does show—that there were staffing vacancies at Marble Hill—can hardly be the basis for inferring that Laval or others at NYCHA took action to prevent the filling of those vacancies.

Likewise, Parris has not presented any evidence to support the conclusion that Laval or anyone else at NYCHA took steps to impede his ability to remediate the heating issues at Marble Hill.  Here too, it is beyond dispute that there indeed were heating problems at Marble Hill.  But Laval promptly responded to the emails Parris sent on this subject, Dkt. 117-29 at 1, 3, and additional administrators at NYCHA indicated their shared concerns with the situation, *see id.* at 2; Pl. Counter 56.1 Stmt. ¶ 32a (citing Dkt. 117-32); Dkt. 117-33.  Indeed, Parris does not cite any evidence from which the Court can infer that he suffered a material adverse change, or indeed any change, to the terms and conditions of his role by virtue of acts taken by Laval or anyone else at NYCHA regarding Marble Hill.

Nor could any rational jury conclude from the evidence that Parris suffered a material adverse change in his job responsibilities at Castle Hill.  Parris asserts that Laval "significantly diminished and negatively affected Plaintiff's material job responsibilities" in three ways relevant to Castle Hill, namely by:

> (1) openly chastising Plaintiff in an email on April 28, 2017 when Plaintiff was simply following up on numerous emails that were sent from February to April 2017 regarding parts that were needed to repair the heating tank rooms; (2) failing to help remediate funding issues and tenant complaints for bathroom tubs and the painting of terraces that were made in May, June and August 2017; and (3) failing to provide Plaintiff with the support required to address the poor workmanship issues with Teenusa Contractor.

Opposition at 18-19 (citations omitted).  The first of these, while not an unreasonable portrayal of the email in question, *see* Dkt. 117-20, does not amount to an adverse action.  *See Stewart v. City of New York*, No. 22-2775, 2023 WL 6970127, at *2 (2d Cir. Oct. 23, 2023) ("[C]riticism, verbal reprimands, and notices of potential discipline, by themselves, do not qualify as adverse employment actions." (citing *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019))); *Moschetti v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 3161 (KMK), 2018 WL 4759787, at *14 (S.D.N.Y. Sept. 28, 2018) ("Even if Plaintiff found the post-observation conference unnecessarily harsh and

critical . . . it hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." (internal quotation marks and bracket omitted)), *aff'd*, 778 F. App'x 65 (2d Cir. 2019); *cf. Hayle v. Nassau Health Care Corp.*, No. 08 Civ. 2396 (DRH), 2013 WL 6231164, at *5 (E.D.N.Y. Dec. 2, 2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (stating that "a bruised ego" does not "constitute a tangible or materially adverse employment action").

As to the remaining supposed adverse actions at Castle Hill, Parris has provided no evidence from which a rational jury could conclude that Laval failed to provide assistance or support to Parris. The request to paint the terrace was submitted by Duprey, the Castle Hill superintendent, and appears to have been appropriately rejected because Duprey did not procure three price quotes for the job, as required. *See* Dkt. 117-22; Dkt. 117-23. Parris does not explain how such events in any way diminished his job responsibilities. With respect to the bathroom tubs and the reglazing work of the contractor at Castle Hill, presumably Teenusa,[23] Parris has again failed to explain how Laval impeded his ability to perform his job or in any way diminished his responsibilities. The evidence establishes that Parris received complaints about the quality of work

---

[23] As mentioned, Parris contends that his material job responsibilities at Castle Hill were significantly diminished and negatively affected because, *inter alia*, Laval "fail[ed] to provide Plaintiff with support required to address the poor workmanship issues with Teenusa Contractor." Opposition at 19. While Parris does not make this clear in his brief, Teenusa appears to have been the contractor who performed the aforementioned unsatisfactory reglazing work on a tub at a Castle Hill apartment. *See* Dkt. 117-24 (July 31, 2017 email from Parris regarding unsatisfactory reglazing work performed on a tub at 2140 Seward Avenue, Apartment 1C, with an attached NYCHA Statement of Services dated June 15, 2017 for "reglaze bathroom" work performed by Teenusa Construction Corp.); Dkt. 117-25 (August 7, 2017 email from Parris regarding unsatisfactory work performed by Teenusa on a tub at 2140 Seward Avenue, Apartment 1C); 117-27 (August 15, 2017 email from Duprey to Parris, copying others, indicating that "[t]he vendor returned to glaze the bathroom tub over in the following apartments," to include 2140 Seward Avenue, Apartment 1C).

performed by a contractor when reglazing tubs at Castle Hill, that he reported his concerns about the contractor to the IG, that the contractor eventually returned to the property to reglaze the tub for one of the complaining tenants (and apparently other tubs), and that the tenant was pleased with the result of that reglazing.  *See* Dkt. 117-21; Dkt. 117-24; Dkt. 117-25; Dkt. 117-26; Dkt. 117-27.  This sequence suggests no improper action by Laval to impede Parris's ability to do his job.  Thus, in sum, the evidence adduced by Parris falls well short of establishing a material adverse change in the terms and conditions of his job due to any events at Castle Hill.

Finally, the evidence presented about events at Drew Hamilton is also insufficient to permit a rational jury to conclude that Parris suffered a material adverse change in the terms and conditions of his employment.  Parris presents three ways that he claims Laval "significantly and negatively affected" his "material job responsibilities" with respect to Drew Hamilton.  Opposition at 18.  These are by:

> (1) failing to permit Plaintiff to properly redress a tenant who complained that her signature was forged by someone in the management office; (2) failing to address and provide Plaintiff with the tools to remediate the deplorable conditions at the building and the corresponding complaints that were raised at a tenant association meeting; [and] (3) failing to handle the poor performance by Teri Dawson and Ronald Boddie.

*Id.* (citations omitted).  Parris has provided no evidence to support the first theory.  The only relevant evidence is a copy of the email from the tenant to Parris reporting the purported forgery. *See* Dkt. 117-43.  Parris additionally claims in his Rule 56.1 counter-statement that Dawson "told [him] to leave the matter alone" and that Parris reported the incident to the IG, but neither assertion is supported by citation to evidence.  *See* Pl. Counter 56.1 Stmt. ¶ 43a.  There is simply no basis for reaching the conclusion that Parris was in any way prevented from taking any action regarding the forgery report.

Parris's second and third theories fare no better.  Laval promptly—within two hours—emailed human resources to request that Boddie be demoted "immediately" upon receiving the request for his demotion from Parris.  Pl. Counter 56.1 Stmt. ¶ 48a; Dkt. 117-48.  Although there is evidence suggesting poor performance by Dawson, Dkt. 117-46; Pl. Counter 56.1 Stmt. ¶ 47a, there is no evidence that Laval at any point impeded any disciplinary actions against Dawson; indeed, Parris issued two memoranda counseling her for lateness and other performance issues, Dkt. 117-46.  Parris seems bothered that Laval allowed Dawson more than the six hours that Parris wanted to give her to complete a comprehensive report for the incoming manager at Drew Hamilton, but that frustration certainly does not support the conclusion that Laval significantly and materially diminished Parris's job responsibilities.  And Parris has provided no evidence that Laval in any way refused to provide Parris with resources to address issues at Drew Hamilton.  The proffered evidence does not support, and if anything directly contradicts, the notion that Laval perpetrated a materially adverse change in Parris's job responsibilities or working conditions through the events pertaining to Drew Hamilton.

In sum, the events established by Parris's evidence fall woefully short of establishing that he suffered an adverse action.  Parris points to no evidence indicating that his job responsibilities were, in fact, diminished; rather, the circumstances here amount to funding and staffing shortfalls that, at most, made it difficult for him to undertake the management steps he felt were needed to keep his developments operating at the appropriate levels.  Indeed, Parris's developments received funding that had been earmarked for another development on two separate occasions.  Defts. 56.1 Stmt. ¶¶ 24, 75.[24]  The funding and staffing difficulties Parris encountered are thus clearly more

---

[24] Although Parris denies paragraph 75 of Defendant's Rule 56.1 statement, the actual content of the denial asserts only that Defendants' statement omitted detail about the roof leak at

akin to "inconveniences" than a material adverse change.  *See Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 677-78, 681 (S.D.N.Y. 2011) (holding that the plaintiff suffered no adverse employment action when she had not been demoted, suffered no loss in material benefits, and had no significantly diminished responsibilities, despite her supervisors "failing to provide her with necessary information and/or support, thereby setting her up to fail" (internal quotation marks omitted)).  Accordingly, Parris's FCA and NYFCA claims are dismissed with prejudice.[25]

### B.    Remaining State Law Claims

Having dismissed Parris's federal claim under the FCA and the state law analog under the NYFCA, the Court declines to exercise supplemental jurisdiction over the remainder of his state law claims for negligent hiring, retention, and supervision of employees and for defamation and defamation *per se*.  *See Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009) (noting that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims" and affirming dismissal of state law claims after dismissal of federal claims at summary judgment (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003))); *Ebel v. G/O Media, Inc.*, No. 20 Civ. 7483 (PAE), 2022 WL 2359245, at *29 (S.D.N.Y. June 30, 2022) (stating that courts "commonly decline to exercise supplemental jurisdiction at this stage—after entering summary judgment on all federal claims" and collecting cases); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where

---

Moore.  Pl. Counter 56.1 Stmt. ¶ 75.  Parris does not contest that the funding request was approved and funds were subsequently transferred.  *See id.*

[25] Because Parris has failed to provide any evidence of an adverse action, the Court does not reach the question of whether any adverse action was taken because of any protected activity.

federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (internal quotation marks omitted)).  Thus, while the Court grants summary judgment on and dismisses with prejudice Counts One and Two—the federal claim over which it has original jurisdiction and that claim's state law analog, which is assessed under identical legal standards—it dismisses Counts Three and Five without prejudice to refiling in state court.  Parris will suffer no prejudice from this decision because the statute of limitations for those state law claims has been tolled during the pendency of this suit.  *See Artis v. District of Columbia*, 583 U.S. 71, 75 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.*, to stop the clock.").  And after a lengthy period of discovery in this case, Parris presumably has secured the discovery he would need to bring this case to trial in state court.

## IV.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment.  Counts One and Two are dismissed with prejudice, and Counts Three and Five are dismissed without prejudice to Parris refiling them in state court.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 110, enter judgment, and close this case.

SO ORDERED.

Dated: March 29, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge